Filed 8/10/23  In re Z.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re Z.B., a Person Coming Under the Juvenile Court Law. | C096441, C096683 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STK-JD-DP-2020-0000143) |
| Plaintiff and Respondent, | |
| v. | |
| T.B., | |
| Defendant and Appellant. | |

In these consolidated cases, C096441 and C096683, appellant T.B. (mother), mother of the minor, appeals from the juvenile court's order terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; statutory section citations that follow are found in the Welfare and Institutions Code unless

1

otherwise stated.)  Mother challenges the juvenile court's summary denial of her section 388 petition seeking placement of the minor in her home with family maintenance services.  Mother also claims the court erred by finding neither the beneficial parental relationship exception to adoption nor the sibling relationship exception to adoption applied.  (§ 366.26, subd. (c)(1)(B)(i) & (v).)  We affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

T.B. previously filed related appeals from orders issued by the juvenile court in San Joaquin County (*In re Z.B.* (Apr. 27, 2023, C095624 & C095625) [nonpub. opn.]).  Remittiturs issued in those consolidated cases on July 20, 2023, and the judgments are therefore final.  (See *McClain v. Rush* (1989) 216 Cal.App.3d 18, 26 [issuance of remittitur after appeal renders judgment final and unassailable for all purposes, including collateral estoppel and res judicata].)

We take judicial notice of this court's unpublished opinion filed April 27, 2023.  (Evid. Code, § 452, subds. (c) & (d).)  A portion of the background is taken, verbatim, from that unpublished opinion.  We do so because mother construes the record in her favor, ignoring the well-established rule that the juvenile court is the finder of fact, and we construe the record in the light most favorable to the juvenile court's order.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1088-1089.)  The remainder reflects a summary of combined factual and procedural history from the current consolidated cases as follows.

In May 2020, the [San Joaquin County Human Services Agency (Agency)] learned of problems between mother and eight-year-old B.B. (the minor's half-sibling), whose biological father was reportedly incarcerated.  B.B. lived with the minor, mother, and mother's boyfriend, but she had been staying with mother's friend because mother was threatening to drop her off at a children's shelter.  B.B. reported that mother verbally and physically abused her and told her and others that she "does not want [B.B.]

2

anymore." B.B. was taken into protective custody and placed with grandfather. The social worker informed the shelter that background checks for grandfather and his wife had been cleared by the Department of Justice and child protective services, and a home assessment regarding B.B. was scheduled for grandfather.

On May 20, 2020, the Agency filed a dependency petition pursuant to section 300, subdivisions (b), (c), (g), and (j) on behalf of B.B., and subdivisions (b), (g), and (j) on behalf of the minor (then four months old). The petition alleged mother used methamphetamine at the time of B.B.'s birth, and that she had relapsed and was using methamphetamine and marijuana. The juvenile court sustained the allegations in the petition (as amended in court), took jurisdiction over B.B. and the minor, ordered the minor removed from parental custody, and ordered supervised visitation and drug court for mother.

When the minor was removed from mother's custody, the Agency asked grandfather about accepting placement. Given his surgery and ongoing chemotherapy treatment for pancreatic cancer, grandfather declined.

The Agency reported that mother wanted the minor returned but did not want to reunify with B.B. By February 2021, mother had disavowed B.B. entirely, wanting nothing to do with the child and choosing to reunify only with the minor. Mother was reportedly using substances again and failed to follow through with counseling and mental health treatment for B.B.

In April 2021, and again in May 2021, F.H., father of three of the minor's half siblings, and his wife C.H. (the H. family) came forward and inquired about placement of both B.B. and the minor. However, B.B. had already been placed with grandfather and his wife and the minor was placed in a foster home. Grandfather and his wife were struggling with some of B.B.'s behaviors and working with a community support group to maintain placement of the child. The minor had been placed on an emergency basis with a family friend. However, after approximately five months, the family friend no

longer wanted to care for or provide permanency for the minor and gave notice. The minor was then removed and placed in a foster home.

The Agency reported that, while it was appropriate to maintain a sibling relationship, the minor and B.B. were not placed together because they were not removed at the same time, and because grandfather and his wife were not willing to take the minor into their home. Grandfather and his wife were, however, willing to visit with the minor and have sibling visits in their home. However, they had ongoing concerns about B.B.'s behavioral issues and their own age and health issues and were still deciding whether they wanted to provide any form of long-term care for B.B.

At the contested disposition hearing on April 21, 2021, the court bypassed mother for reunification services and reduced her visitation to one time per week.

On July 7, 2021, the court heard arguments regarding F.H.'s request for placement of the minor in his home. The Agency informed the court that, in early June 2021, the minor had been in a stable foster placement when her caretaker unexpectedly died. The Agape Villages Foster Family Agency (FFA) social worker discovered the caretaker had passed away when he went to pick up the minor for her visit with mother. Because it was a Friday afternoon and it was unknown how long the minor had been in the home with her deceased caretaker, it was urgent that the minor be immediately placed with certified caretakers. Thus, the FFA immediately placed the minor with her new caretakers "under respite conditions." When the Agency became aware of the caretaker's death one week later, the Agency social worker immediately scheduled child family team (CFT) meetings to discuss relative placement. In the June 2021 and July 2021 CFT meetings, grandfather and his wife stated they wanted the minor to be placed with and adopted by F.H. and his family . . . . The minor's present caretaker, however, expressed concern regarding the minor's emotional dysregulation following visits with the H. family.

The Agency argued in favor of placement with the H. family. It argued the minor's emotional dysregulation following visits with them was due to the minor's

4

unexpected transition to a new foster home following the death of her previous caretaker. Minor's counsel objected to placement of the minor with the H. family because the three H. family half siblings continued to have a relationship and unsupervised contact with mother, who posed a risk to the minor. The minor's counsel also objected to moving the minor at all given the traumatic event the child recently experienced with the unexpected passing of her caretaker. Counsel noted the minor was settling into her new placement and was doing well and it would be detrimental to move her.

The Agency disagreed and argued it would not be detrimental to move the minor from her present caretaker, having been placed there for just three weeks "due to a respite emergency situation" (i.e., the unexpected death of the foster parent), and it would be better for the minor to be with relatives such as the H. family. Minor's counsel countered that there was no relative placement preference given that the case was postdisposition, the minor was in a concurrent home, and there was no need to move her. Counsel argued further that the minor, who was only one and a half years old, was not raised in the same household as the H. family half siblings and was likely not as bonded to those children as they were to her. The court ordered increased visitation between the minor and the H. family siblings to determine the nature and extent of any connection between the children.

On August 25, 2021, the Agency reported that B.B. was doing well in the care of grandfather and his wife, and was closely bonded to and wanted to continue visits with the minor. The Agency reiterated that the minor had not been placed with B.B. because grandfather and his wife had indicated they were not in a position to take the minor into their home. It was also noted again that grandfather and his wife had not yet decided whether they wanted to establish some form of long-term care or permanency of B.B.

At the August 25, 2021 review hearing, the Agency reported receipt of a relative information form filed by the maternal grandmother raising "significant concerns" regarding the appropriateness of the H. family home for placement of the minor,

5

including that F.H. had previously been in a long-term relationship with mother during which mother and F.H. both used drugs and were involved in domestic violence and F.H. repeatedly allowed mother to be in the presence of the minor in violation of the court's order. The Agency was initially not inclined to believe the statements made by the maternal grandmother and was still confident in the eventual plan to move the minor to the H. family home. However, as the resource family approval process (RFA) continued, the Agency gathered information that tended to support the concerns raised by the maternal grandmother and, as a result, the Agency determined in October 2021 that the H. family would no longer be considered for placement. The Agency noted the current caretaker was willing to be a concurrent home for the minor and was committed to maintaining a relationship between the minor and the half siblings going forward so there was no need to move the minor.

Mother objected to the maternal grandmother's unsworn statements, claiming the grandmother was estranged from the rest of the family. Mother argued that, when the minor's prior foster mother passed away, the Agency should have placed the minor with a relative or a nonrelated extended family member, but instead placed the minor with a nonrelated foster caretaker. Mother stated she intended to submit a voluntary relinquishment of her parental rights over the minor to the H. family and, in the event that failed, to grandfather who already had custody of B.B. The Agency argued it would reject mother's voluntary relinquishment as to the H. family and would not provide an approved adoptive home study for the family, both of which would be required for a relinquishment. Mother requested a placement hearing and asserted that grandfather was now willing to take the minor and was already RFA approved. The court instructed mother to file an appropriate motion.

On September 2, 2021, the maternal grandmother filed a second relative information form setting forth her concerns regarding the Agency's plan to place the minor with grandfather and his wife, including that grandfather and his wife could not

6

agree on whether to take permanent placement of B.B., let alone the minor, grandfather had admitted his poor health, and grandfather could not be trusted to keep the minor away from mother.

In September 2021, the Agency reported that the minor had been placed with her current caretaker under respite conditions after her previous foster mother passed away unexpectedly. F.H. was approved for placement and the H. family wanted to adopt both the minor and B.B. in order to ensure the sibling bond between them remained intact.

The Agency reported that the minor appeared to be comfortable with grandfather and his wife, and that grandfather was now requesting that the minor be placed with them so that the minor and B.B. could grow up together. The two children reportedly had an "undeniable bond." The Agency stated it was appropriate to maintain the relationships between the minor and all of her half siblings, including the H. family half siblings. However, the Agency was not willing to place the minor with the H. family given the concerns raised by the maternal grandmother, and the fact that assessment of grandfather's home was underway, and the Agency was awaiting the court's determination at the upcoming placement hearing.

On September 7, 2021, mother filed a motion for change of placement of the minor together with the supporting declaration of grandfather. Mother argued it was in the minor's best interest to be placed and raised with her siblings, whether that be in the home of grandfather or the H. family. Grandfather made some of these same arguments in his declaration, as well as his responses to a number of the claims and accusations lodged by the maternal grandmother in her relative information forms. Finally, grandfather asserted that B.B. wanted to live and grow up with the minor and he and his wife could and would provide a safe, stable, permanent home for both children.

At the September 7, 2021, review hearing, B.B. requested to be heard in chambers, where she informed the court of her desire to be placed with the minor in the home of the

H. family.  The court adopted the Agency's recommended findings, including that B.B.'s current placement with grandfather was appropriate.

In its October 2021 report, the Agency reported that grandfather and his wife were no longer being considered for placement given issues grandfather and his wife were having with B.B., which would be exacerbated by adding the minor to the household, and given the Agency's suspicions that grandfather would allow mother unsupervised access to the minor.  The Agency further reported that, while the minor's extended family clearly loved her, the minor was thriving, stable, and bonded with her current caretakers who were providing for her physical and emotional needs and were willing to adopt her. The Agency was in the process of assessing the minor's foster family for prospective adoption.  The minor continued to visit with her half siblings, grandfather, and the H. family, all of whom she recognized and enjoyed.  The Agency recommended termination of parental rights with a permanent plan of adoption.

The initial section 366.26 hearing on October 13, 2021, was preceded by a continued placement hearing.  The Agency informed the court that the H. family had withdrawn their request for placement after learning their RFA application would be denied.  Mother's counsel stated the minor's caretakers were willing to adopt the minor but were unwilling to adopt B.B.  The court continued the hearing and, subsequent thereto, found the minor's current caretakers to be de facto parents.

At the December 17, 2021, continued placement hearing, mother's counsel informed the court that grandfather and his wife wanted placement of the minor, but that mother would nevertheless consent to placement with the minor's current caretakers if the minor and B.B. were placed there together.  The Agency declined to consent to mother's offer unless ordered to do so by the court, stating it would place undue pressure on the caretakers.  The Agency also noted it continued to have concerns regarding B.B.'s 'tenuous' placement with grandfather and his potential inability to keep B.B. long term. The court continued the placement hearing and trailed the section 366.26 hearing.

8

In January 2022, the Agency reported the minor's biological father, R.M. (father), who had recently become a participant in the proceedings, had indicated he did not have the desire or the financial means to care for the minor and waived his right to participate in further dependency proceedings.

Mother objected to adoption by a nonrelative and again requested that the minor be placed with grandfather. Visits between the minor and her half siblings were arranged by the minor's caretakers, the H. family, and grandfather in the hopes that such arrangement would continue even if the minor were adopted by her caretakers, who continued to express their commitment to maintaining the sibling relationships, as well as the relationship between the minor and the grandparents postadoption.

On January 12, 2022, mother filed a supplemental brief again requesting placement of the minor with grandfather. Mother argued grandfather should have been considered for placement in June 2021 when the minor's placement changed due to the unexpected death of her caretaker. She further argued she had repeatedly offered to voluntarily relinquish her parental rights to grandfather, who she argued was ready, willing, and able to provide permanency for the minor and B.B.

At the January 14, 2022, continued placement hearing, the Agency informed the court of its opposition to mother's request to place the minor with grandfather. Social worker Luz Mayorga testified that the minor required a new placement in June 2021 due to the unexpected passing of her foster mother. While it was the Agency's normal practice to assess relatives and nonrelatives for placement, the Agency did not consider grandfather for placement at that time because the FFA handled the emergency placement of the minor. Mayorga did not learn about the caretaker's death until after the minor had been in the home of the new caretakers for one week. Mayorga did not know why the FFA did not consider grandfather or any other relative for placement at the time of the emergency removal. She opined that, given B.B.'s placement in grandfather's home, grandfather should have been assessed for emergency placement. However, when

9

Mayorga learned about the death of the caretaker, she did convene a CFT meeting to discuss relative placement. The FFA social worker, the new caretakers, mother, grandfather, and the maternal grandmother all participated. At that time, grandfather wanted the minor placed with the H. family and it was the Agency's intention to do so, however, the minor's counsel objected based on the maternal grandmother's statements of concerns.

Mayorga testified further that the Agency normally attempted to place siblings together but grandfather declined placement after the death of the caretaker and, by the time he requested placement and was RFA approved, there were concerns about suspected emotional abuse of B.B. in grandfather's home as well as marital difficulties between grandfather and his wife, who were reportedly "on [the] verge of a divorce" because grandfather's wife did not want the minor placed in their home. Those concerns arose shortly after B.B.'s placement with grandfather, whose wife believed it was only a temporary placement. Mayorga also testified that the Agency did not accept mother's offer to execute a voluntary relinquishment of her parental rights over the minor to grandfather because of those concerns and the Agency feared that placing the minor in grandfather's home would do nothing to alleviate the existing problems and would place the minor in a "dysfunctional household."

Mayorga further testified that the minor had a bond with her current caretakers, referring to her foster parents as "mom" and "daddy," often seeking them out, and wanting to be held or carried by them. The Agency felt it was neither appropriate nor in the minor's best interest to place the minor with grandfather because the minor was bonded to her caretakers and not grandfather or his wife and this would be the minor's fourth placement. Mayorga stated that, during visits between the minor and grandfather and his wife, the minor usually sought out B.B. for care and comfort rather than grandfather or his wife. Mayorga opined that the minor was doing well with her caretakers and the behavioral concerns she initially had were no longer present.

10

Grandfather confirmed he initially declined placement of the minor because he was recovering from cancer surgery and chemotherapy, but he stated he was now fully recovered and his cancer was in remission. He denied using illegal substances as alleged by the maternal grandmother. He testified his relationship with mother (his daughter) was strained due to the way mother emotionally abused B.B., and he stated he never allowed mother to have unsupervised contact with B.B. Grandfather testified that he did not request placement of the minor at the June 2021 CFT meeting because it was his view that the minor and B.B. should be placed with the H. family. However, once the H. family withdrew from the RFA process, he told the social worker he was willing to adopt both B.B. and the minor. He testified his wife was not initially on board with adopting both B.B. and the minor, but after having a serious discussion in October 2021 and completing all of the required classes, she was. He was RFA approved for B.B. Grandfather testified he was now able to care for and provide for the minor and protect the minor from mother. His wife was also willing to adopt the minor and B.B. He denied any domestic violence with his wife or any emotional abuse of B.B. by his wife.

Mother testified she wanted the minor and B.B. to be placed together and she was willing to relinquish her parental rights to either the current caretakers or grandfather with that proviso. The parties stipulated that B.B. would testify she wanted to live with the minor and she felt safe in the home of grandfather and his wife. After hearing argument, the court took the matter under submission.

On January 21, 2022, the court denied mother's motion for change of placement, ordered that the minor remain with her current caretakers, and confirmed the matter for a contested section 366.26 hearing.

Mother, grandfather, and B.B. appealed from the juvenile court's orders denying placement of the minor with grandfather. This court subsequently affirmed the juvenile court's orders in that regard.

11

On February 25, 2022, the San Joaquin County Human Services Agency (Agency) filed a status review report stating the minor continued to flourish with her prospective adoptive parents. Increased visitation between the minor and B.B. had yet to begin due to the caretakers' concerns that the minor might become overwhelmed and dysregulated. The minor was reportedly developing appropriately and was receiving weekly therapeutic services to work on, among other things, her attachment dysregulation issues. It was also noted that, while the court recently denied mother's request for a placement change into the home of B.B., the minor and all of the half siblings were currently visiting one another at least once a week and the prospective adoptive family hoped to continue the relationship between the children postadoption. B.B. informed the Agency that it was her continued desire to spend more time with the minor and that the minor live with her at grandfather's home.

On March 1, 2022, the court set the matter for a section 366.26 hearing on March 18, 2022. That date was subsequently continued to May 20, 2022.

On May 16, 2022, mother filed a section 388 petition requesting that the court vacate its previous order denying her reunification services and place the minor in her custody with six months of family maintenance services or, alternatively, vacate the section 366.26 hearing and provide mother with six months of reunification services. Mother argued she "maintained frequent and continuous contact with the minor," "private-paid and completed a plethora of services including inpatient treatment, parenting, individual therapy, [and] intense aftercare outpatient, and . . . submitted to hair follicle testing every other month all of which are negative for all substances." Mother alleged the requested change would be in the minor's best interest because the minor "is not doing well with [her caretakers]"; mother "can provide a safe, stable, permanent home for [the minor]"; the minor "will have ample access to her siblings"; mother "has demonstrated changed circumstances such that the child will be safe in her care"; and mother and the minor "share a strong mutual attachment and the child calls mother

12

'mommy.' " In a memorandum of points and authorities accompanying her petition, mother argued she completed inpatient treatment in August 2021 and "has remained clean and sober since completion." She also argued that, since hair follicle testing "covers 90-day periods," it was "more likely than not that Mother has been clean from all substances from August 2021 to [May 16, 2022]."

The Agency opposed mother's section 388 petition arguing mother previously completed substance abuse treatment and other components of her 2012 dependency action, relapsed the day that action was dismissed, continued to abuse substances and was convicted for possession of a controlled substance in 2019, and tested positive for cannabis and alcohol in December 2020 and again in February 2021 when reporting to an outpatient treatment program. Her participation in the outpatient program was "at best inconsistent," she tested positive for drugs in March and April 2021, and she admitted she relapsed on methamphetamine on April 9, 2021. As a result, mother was bypassed for reunification services.

The Agency further argued mother's petition failed to make a prima facie showing of changed circumstances, or that the requested change was in the minor's best interests, and made conclusory statements without providing supporting documentation. Finally, the Agency argued mother's section 388 was untimely pursuant to the Superior Court of San Joaquin County, Local Rules, rule 5-300(B) (local rule 5-300(B)), which provides, in pertinent part: "Application shall be made to the Court in a timely manner following discovery of the circumstances alleged to support the petition to modify, and in no event, at a later time which prejudices any party. Applications requesting return of a minor to a parent shall be made not less than 20 judicial days before any previously set hearing pursuant to [section 366.26]. Where hearing for any petition is requested within 20 judicial days, good cause must be shown in a supporting declaration."

The minor also opposed mother's section 388 petition arguing mother's completion of a number of classes and therapy sessions predated the dispositional order

13

and therefore did not demonstrate changed circumstances; while mother's nine months of sobriety was commendable, that relatively short period of sobriety was insufficient to show changed circumstances given mother's extensive history of substance abuse; and mother failed to demonstrate the requested change was in the minor's best interests.

On May 20, 2022, the court heard argument on mother's section 388 petition, took the matter under submission, and continued the section 366.26 hearing.

On June 8, 2022, the court denied mother's section 388 petition without an evidentiary hearing. The court stated as its reason for denial that the petition was untimely pursuant to local rule 5-300(B), there was no prima facie evidence to support mother's "conclusionary statements" of changed circumstances, mother's circumstances were "changing," and there was no showing that the requested change was in the minor's best interests. The court also set the section 366.26 hearing for July 20, 2022.

The Agency's July 2022 status review report focused on the minor's half sibling, B.B., noting it was in B.B.'s best interest to maintain her sibling relationship with the minor, as the two children were bonded and had been living together prior to removal. The Agency reiterated that the minor and B.B. were not placed together because they had not been removed at the same time and grandfather and his wife were not in a position to take the minor into their home. It was noted, however, that the minor and B.B. were regularly visiting one another.

On July 20, 2022, the court commenced a contested section 366.26 hearing. At the time of the hearing, the minor was two years old and B.B. was 10 years old. The social worker testified that mother had visited with the minor regularly for approximately two years. During those visits, the minor recognized mother and willingly went to her, and the two spent time playing. But, when the visits were over and it was time to go, the minor "easily depart[ed] from" mother. The social worker testified that the postadoption contract agreement called for sibling visitation and visitation between the minor and maternal grandmother. The social worker opined that it would not be detrimental for the

14

minor to terminate the parent-child relationship based on the tender age of the minor when she was removed (four months of age) and the amount of time the minor spent growing up in the care of nonrelatives as compared to the time she lived with mother. The social worker acknowledged mother's weekly visitation but determined it did not outweigh the time the minor spent forming attachments to her caregivers.

The social worker testified the minor had visits with B.B. and the other three half siblings at least once a week and separate visits on a weekly basis with B.B. only. She opined that the visits between the minor and B.B. were "very meaningful" to B.B., who looked forward to the meetings. No similar remarks were made with respect to the importance of the visits to the minor. The social worker further opined that placing the minor separate from her siblings would "not have an [e]ffect on [the minor]" given her young age.

After hearing impassioned argument from counsel, the court found that terminating the minor's relationship with either mother or the minor's half siblings would not cause detriment sufficient to outweigh the benefits of adoption and therefore neither the beneficial parental relationship exception nor the sibling relationship exception applied. The court terminated parental rights, finding it was in the minor's best interest to do so.

DISCUSSION

I

*Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her section 388 petition without a hearing. She claims the petition showed a change in circumstances and that the requested modification was in the minor's best interests. As we explain, the juvenile court did not err.

15

A petition to change or modify a juvenile court order under section 388 must factually allege there are changed circumstances or new evidence to justify the requested order, and that the requested order would serve the minor's best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.) The petitioner has the burden of proof on both points by a preponderance of the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48, disapproved of on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).) The parent must make " '[s]pecific allegations describing the evidence constituting the proffered changed circumstances or new evidence' is required. [Citation.] Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

The petition must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 5.570(a).) The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing. (*In re Daijah T., supra,* 83 Cal.App.4th at p. 673.) " 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' " (*Ibid.*) Nonetheless, if the juvenile court finds the petition fails to make a prima facie case as to either or both tests under section 388, the juvenile court may deny the petition without an evidentiary hearing. (*In re Justice P., supra,* 123 Cal.App.4th at p. 189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see Cal. Rules of Court, rule 5.570(d).) We review the summary denial of a section 388 petition for abuse of discretion. (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250; *In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Here, mother failed to make the prima facie showing necessary to obtain an evidentiary hearing. Mother alleged circumstances had changed as demonstrated by her "frequent and continuous contact with the minor"; completion of services she paid for, including inpatient treatment, parenting, individual therapy, and intense aftercare outpatient; and hair follicle testing showing she was negative for all substances. However, the fact that mother regularly visited the minor was consistent with her regular visitation over the two-year span of the case and thus showed no change. Likewise, regarding mother's privately paid services, the documentation mother attached showed the individual therapy sessions and one of the two parenting courses were completed prior to April 21, 2021. That is, the information was available when the court bypassed mother's services and therefore did not show changed circumstances.

As for the remainder of the privately paid services and drug tests, mother provided conclusory statements regarding her participation, supported by a certificate of completion of the parenting class, documents showing her hair follicle tests were negative, and a letter from a resident advisor at The Lakes Treatment Center. "The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) Mother's petition contained nothing to demonstrate she tested regularly or that the four tests she did take were randomly scheduled, nor did it demonstrate she completed the treatment program at all. That information was key to any determination of whether circumstances had changed given mother's history of drug use and previous failures to stay clean. The fact that she participated in an inpatient treatment program and drug tested four times over the course of one year did little to demonstrate changed circumstances, especially in light of her substance abuse history.

As the juvenile court found, mother's petition showed, at best, that mother was in the process of change, but had not set forth a prima facie showing of changed circumstances. The arguments, contained in the memorandum of points and authorities attached to mother's petition -- that mother "successfully completed inpatient treatment

in August 2021 and has remained clean and sober since completion," that "[h]air follicle testing covers 90-day periods," and that "it is more likely than not that Mother has been clean from all substances from August 2021 to [May 16, 2022]" -- were not evidence of a change of circumstances. Even assuming mother's sobriety for nine months, "[i]n the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F., supra,* 68 Cal.App.5th at p. 121.) As the cases demonstrate, mother's brief period of sobriety was not enough to demonstrate a change in circumstances. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [changed circumstances were not satisfied by three months of sobriety]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [changed circumstances not satisfied by father's seven months of sobriety]; *In re Kimberly F., supra,* 56 Cal.App.4th at p. 531, fn. 9 ["Likewise the parent who loses custody of a child because of the consumption of illegal drugs and whose compliance with a reunification plan is incomplete during the reunification period. It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) Mother's conclusory and unsupported statements regarding her participation in and completion of privately paid services leading to nine months of sobriety was insufficient to demonstrate mother's circumstances had changed.

Given mother's failure to demonstrate a prima facie case of changed circumstances, we need not reach the issue of whether mother made a prima facie showing of how a change in the bypass order would be in the best interest of the minor. (*In re Casey D., supra,* 70 Cal.App.4th at p. 48; *In re Justice P., supra,* 123 Cal.App.4th at p. 189.) We note, however, that mother's unsupported allegations, including that the minor "is not doing well with [her caretakers]" and that mother shares a "strong mutual attachment" with the minor, who "will have ample access to her siblings," were also conclusory and would not support a finding that it was in the minor's best interest to

return the minor to mother or grant further reunification services.  (*In re N.F., supra,* 68 Cal.App.5th at p. 120.)  In any event, even assuming mother's circumstances had greatly improved over the past year, the minor's best interests "are not to further delay permanency and stability in favor of rewarding" mother for her "hard work and efforts to reunify."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

We conclude the juvenile court did not abuse its discretion in denying mother's section 388 petition without a hearing.

## II

### *Termination of Parental Rights*

Next, mother contends the juvenile court erred in terminating her parental rights pursuant to section 366.26.  She claims the court erred in finding the beneficial parental relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply, the court erred in denying her request for a bonding study, and the court should have considered legal guardianship as an alternative to adoption.  She also claims the court erred when it failed to apply the sibling relationship exception to adoption.  (§ 366.26, subd. (c)(1)(B)(v).)  These claims lack merit.

A.      <u>Beneficial</u> <u>Parental</u> <u>Relationship</u> <u>Exception</u>

We first reject mother's claims that the court failed to properly analyze the applicability of the beneficial parental relationship exception under *Caden C., supra,* 11 Cal.5th 614, and erred in failing to find the exception applicable.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption.  [Citation.]'  [Citation.]  If the court finds the child is adoptable, it must terminate parental rights absent circumstances under which it would be detrimental to the child."  (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)  There are only limited circumstances that permit the court

19

to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra,* 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra,* 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) For the beneficial parental relationship exception to apply, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.,* at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

As to the first element in *Caden C.*, there was no dispute that mother regularly visited the minor for the two-year period after removal. As for the second element,

20

mother claims she was not merely a friendly visitor but rather she had a substantial, positive emotional attachment with the minor as evidenced by the minor's interactions with her during visits, including the minor smiling at her, laughing, crawling, and playing with her, babbling, and saying, "Ma" to her, hugging and kissing her, and accepting comfort and care from her.

The social worker testified that, while mother's interactions with the minor were appropriate and the minor recognized mother, willingly went to her, and played with her, visits appeared to be "pretty standard and common" and the minor "easily depart[ed] from" mother when the visits were finished. But as to from whom the minor sought comfort, the minor was noted to seek comfort from one of her older half siblings and the social worker and, whenever present, her caregiver. The minor reportedly seemed most comfortable in the presence of "motherly role figures" such as C.H., half sibling B.B., and one of the minor's older half siblings, sometimes also referring to *them* as "momma."

With respect to the third *Caden C.* element, the social worker testified she did not believe termination of the parent-child relationship would be detrimental to the minor considering the age of the minor at removal (four months) and the time the minor spent growing up in the care of nonrelatives (nearly two years) compared to the time the minor lived with mother (four months). Mother failed to present any evidence that terminating the minor's relationship with her would be detrimental to the minor when balanced against the benefits of adoption. In fact, although she visited regularly, she failed to show any benefit to the minor of continuing their relationship beyond the incidental benefit that generally arises from interaction between natural parent and child. And the only evidence reflecting the minor's feelings about separation from mother was that the minor separated easily at the end of visits. There was no evidence the minor missed mother between visits or asked for more visits.

Mother claims she was hampered in making the requisite showing by the court's erroneous denial of her request for a bonding study and its failure to order one sua sponte.

The juvenile court, however, has no sua sponte duty to order a bonding study. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339-1340.) If a bonding study is needed, it is incumbent on mother to request one. (*Id.* at p. 1339.) Yet, the only support mother provides for her alternative contention that the court erroneously denied her request is the following statement, made by her attorney at the May 20, 2022, hearing on her section 388 petition: "This Court denied my request for a bonding study earlier on in this case, and so we don't have a bonding study. We would have had a bonding study." Mother provides no record citation supporting her claim that she ever actually requested a bonding study, whether it be prior to, during, or after the May 20, 2022, hearing but prior to the July 20, 2022, section 366.26 hearing; nor have we found any such request in the record. As the appellant, it is mother's burden to provide a record demonstrating error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296.) She has not done so here.

Lastly, to the extent mother argues the court should have considered legal guardianship as an alternative to adoption, apart from her failure to prove the application of the exception, we reject the contention. Mother requested we take judicial notice of exhibits consisting of post-judgment guardianship proceeding documents relating to the minor's sibling. We deferred decision on the request pending calendaring and assignment of the panel. We now deny the request because the documents are unnecessary to our resolution of the issues on appeal. There is no general best interest exception to adoption. (*In re Cliffton B., supra,* 81 Cal.App.4th at pp. 426-427.) The statutes and case law have made it clear that parental rights to an adoptable child should be terminated unless one of the statutory exceptions apply. (*Ibid.*) Thus, where, as here, the juvenile court finds the minor adoptable and no exceptions apply, "it is presumed, even in the absence of a specific finding by the court, that adoption is the choice that is in the child's best interests" and " 'the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued.' [Citations.]" (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799.)

22

There was ample evidence to support the court's finding that the beneficial parental relationship exception to adoption did not apply.

## B. Sibling Relationship Exception

Mother also contends the court erred in finding the sibling relationship exception to adoption did not apply.

As previously noted, there are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.) If the court determines that the child has a significant sibling relationship and would suffer detriment if that relationship were severed, the court then must weigh the benefit to the child of continuing the relationship against "the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L.Y.L.,* at pp. 952-953.) As with the beneficial parental relationship exception to adoption, we do not substitute our judgment for that of the

23

juvenile court as to what is in the child's best interest. (*Caden C., supra,* 11 Cal.5th at p. 641.)

There was insufficient evidence here to show that the relationship between the minor and her half siblings was so significant that severing those relationships would have been detrimental to the minor. During the first few months of the minor's life, she lived with mother and B.B. in the home of mother's boyfriend. B.B. was removed first and placed with grandfather. The minor was removed three days later and placed elsewhere because grandfather was undergoing chemotherapy for pancreatic cancer and was unable to assume care of her. Since that time, the minor has never lived with either B.B. or the H. family half siblings. By all accounts, the minor has enjoyed visits with B.B. and the other three half siblings over the two years following her removal. The record makes plain that all of the half siblings, particularly B.B., were very fond of the minor and expressed their desire to be together. However, there was no evidence that the minor, who by the time of the section 366.26 hearing was two years old, expressed a desire to be with her half siblings or had any trouble separating from them at the end of the visits. (See *In re Daniel H., supra,* 999 Cal.App.4th at p. 813. ["the language [of the exception] focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings"].) And while the minor and her half siblings shared visits, they otherwise shared no life experiences, having lived in separate places and having been raised by different people. (§ 366.26, subd. (c)(1)(B)(v).)

Mother bore the burden of demonstrating the sibling relationship exception to adoption applied and failed to make the requisite showing. (*In re Daniel H., supra,* 999 Cal.App.4th at p. 813.) The juvenile court did not err.

24

DISPOSITION

The orders of the juvenile court are affirmed.

_____

HULL, J.

We concur:

_____

EARL, P. J.

_____

DUARTE, J.